# In the United States Court of Federal Claims

### No. 09-421C
### Filed: November 21, 2011

| | |
|---|---|
| * * * * * * * * * * * * * * * * | |
| | * |
| **SAMUEL W. HARRIS,** | * **Military Pay; Lack of Subject Matter** |
| | * **Jurisdiction; Failure to State a** |
| **Plaintiff,** | * **Claim; Cross-Motions for Judgment** |
| | * **on the Administrative Record;** |
| **v.** | * **Voluntary Resignation; Partially** |
| | * **Vacated Court-Martial Conviction.** |
| **UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * | * |

**William E. Cassara**, William E. Cassara, PC, Evans, GA, for the plaintiff.

**Stacey K. Grigsby**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant.  With her were **Bryant G. Snee**, Deputy Director, **Jeanne E. Davidson**, Director, Commercial Litigation Branch, and **Tony West**, Assistant Attorney General, Civil Division.

### O P I N I O N

**HORN, J.**

### FINDINGS OF FACT

Plaintiff Samuel W. Harris was a Lieutenant in the United States Navy until he submitted his resignation from the military on March 19, 2003 and was separated from the Navy on July 1, 2003.  Mr. Harris asks this court to (1) set aside his resignation from the Navy, or, alternatively, to allow him to argue his case before a separation board, (2) order his retroactive promotion to the rank of Lieutenant Commander and award corresponding backpay and allowances, (3) set aside his court-martial conviction for making false statements in violation of Article 107 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 907 (2000), and (4) award plaintiff the $1,000.00 in pay he was required to forfeit as a result of his UCMJ conviction.  The government filed motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  Alternatively, defendant seeks judgment on the Administrative Record, affirming the decision by the Board for Correction of Naval Records (BCNR), which rejected Mr. Harris' claims.  Mr. Harris responded to the defendant's motions to dismiss and cross-moved for judgment on the Administrative Record, asking the court to reject the BCNR decision.

Mr. Harris joined the Navy and was commissioned through the United States Naval Reserve Officers' Training Corps on December 14, 1990.   Prior to the occurrences on the night of January 31, 2001 discussed below, Mr. Harris held the rank of Lieutenant (LT, Officer Grade O-3).   He had been selected for promotion to Lieutenant Commander (Officer Grade O-4) in 2000.   His name had been submitted to the United States Senate for confirmation on September 12, 2000, and the Senate had confirmed his promotion on October 6, 2000.   See 146 Cong. Rec. S8436 (daily ed. Sept. 12, 2000); 146 Cong. Rec. S10117 (daily ed. Oct. 6, 2000).   On April 21, 2001, Mr. Harris received a letter from the Navy notifying him of the decision to delay his promotion.   Prior to the July 1, 2003 date of plaintiff's separation from the Navy, Mr. Harris had not been promoted to the rank of Lieutenant Commander.

On February 1, 2001, a Navy enlisted female reported to the Naval Criminal Investigative Service (NCIS) that Mr. Harris, then known to her only as "Big Sam," along with Navy Lieutenants Roger A. House and Reginal G. Williams, had raped and assaulted her the prior evening at Mr. Harris' house.   NCIS Special Agent Gail Beasley served as the lead investigator in the case.   She interviewed and obtained a sworn statement from the enlisted female on February 2, 2001.   The enlisted female told Special Agent Beasley that on January 31, 2001, she had encountered three men, identified as Reginal Williams, Roger House, and a man she knew only as "Big Sam," subsequently identified as plaintiff Samuel W. Harris, at the Helmsman Club, Naval Support Activity Mid-South, Millington, Tennessee.

According to the Joint Stipulation of Facts submitted by the parties, the enlisted female reported that the following events occurred on the night of January 31, 2001. Mr. Harris and the enlisted female danced together at the Helmsman Club several times during the evening of January 31, 2001.   Eventually, Mr. Harris, Mr. House, and Mr. Williams invited her to a going-away party for Mr. House.   The enlisted female stated that she asked whether any other women would be attending the party, and the men responded affirmatively.   The enlisted female then agreed to attend the party.   At approximately 10:30 p.m., Mr. Harris drove the enlisted female to his house.   No other guests were present when she and Mr. Harris arrived at his home.   The enlisted female stated that, upon entering, the two sat on his couch, where Mr. Harris removed her boots and socks, with her consent.   They later moved to his bedroom where the two engaged in "consensual fondling."   The enlisted female also told Special Agent Beasley that, "LT Harris removed her skirt and panties with her consent."   Further, the enlisted female stated that Mr. Harris was performing oral sex on her when she heard a noise and looked up to see Mr. House and Mr. Williams, in her words, "peeking in the bedroom door."   According to the enlisted female, Mr. House and Mr. Williams were at least partially nude.   The enlisted female stated that after Lieutenants House and Williams walked into the bedroom wearing little clothing, she asked Mr. Harris to take her home, but, according to the enlisted female, the three men raped and assaulted her, despite her protests.   Eventually, according to the enlisted female, Mr. Harris drove her home, although the two stopped for food "at the Connection on the way back which is close to the base."

The City of Memphis Sexual Assault Resource Center performed a rape kit examination on the enlisted female on February 1, 2001.  The Resource Center's Forensic Nursing Evaluation did not note any signs of physical injury.  A saline wet mount, used to detect semen, returned negative results.  The examination report also did not note evidence of any lubricant on the enlisted female's person, although she had reported that one of the men had applied some sort of lubrication.

During the February 2, 2001 NCIS interview with the enlisted female, Special Agent Beasley asked the enlisted female if she would consent to obtaining a wire intercept of a conversation between herself and one of the three alleged assailants.  She consented.  On February 5, 2001, the enlisted female and Special Agent Beasley obtained the wire intercept, which recorded a conversation between the enlisted female and Mr. Williams, with whom the enlisted female claimed to have had a previous relationship.  During the call, she recited her allegations, however, Mr. Williams asked her who she was, what she was talking about, and how he could contact her.

On February 6, 2001, Special Agent Beasley and Special Agent James T. Harrison interviewed Mr. Harris.  According to Special Agent Beasley, she informed Mr. Harris that an enlisted female had stated he had raped her.  Special Agent Beasley asked Mr. Harris if he knew the enlisted female in question.  He replied that he did not and that he did not know what Special Agent Beasley was talking about.  When Special Agent Beasley stated that they were referring to the woman he had met at the Helmsman Club the prior Wednesday evening, January 31, 2001, Mr. Harris acknowledged that he knew the events Special Agent Beasley was referring to, but did not know the name of the woman in question.  Special Agent Beasley also asked Mr. Harris if he knew anything about the February 5, 2001, telephone call between the enlisted female and Mr. Williams.  Mr. Harris stated that he had spoken to Mr. Williams about a telephone call, but stated that the two did not know who the caller was and thought that the call was a prank.  Mr. House and Mr. Williams also were interviewed regarding the allegations.

According to Special Agent Beasley, Mr. Harris stated that on January 31, 2001, after dancing with a woman at the Helmsman Club, whose name he did not know, he invited the woman to a private party at his residence.  She agreed to go with him.  When the two arrived at his home, they immediately adjourned to his bedroom and began, in Mr. Harris' words, as reported by Special Agent Beasley, "fondling one another."  Mr. House and Mr. Williams, who had keys to Mr. Harris' house, then came into Mr. Harris' residence to "check on him."  Special Agent Beasley indicated that Mr. Harris stated that they knocked on his bedroom door, but left after discovering that Mr. Harris was inside.  Also, as reported by Special Agent Beasley, Mr. Harris said the woman became visibly upset, and stated that she "didn't want to get caught with an officer."  Mr. Harris stated that he had been unaware of her enlisted status until then, and, at that point, immediately stopped his actions.  The two got dressed and, according to Mr. Harris, he drove her back to her barracks, stopping for food at a restaurant on the way.

Mr. Harris consented to a search of his residence.   Special Agent Beasley conducted the search with Special Agent Harrison.   In a garbage bag outside of Mr. Harris' house, the agents found a condom box containing both wrapped and unwrapped condoms.   They also found a used condom at the bottom of the bag.   Phillip R. Mills, a civilian forensic examiner at the United States Army Criminal Investigative Laboratory (USACIL), tested three of the condoms found by the NCIS investigators at Mr. Harris' house.   Mr. Mills found no semen present on the three condoms.   There were no epithelial cells present on the first condom, so Mr. Mills did not test it further.   Mr. Mills stated that the outside portion of the second condom contained DNA (deoxyribonucleic acid) that matched that of the enlisted female.   The outside of the third condom contained a DNA pattern that was consistent with that of the enlisted female, and the inside portion of that condom contained epithelial cells consistent with those of Mr. House, however, the match was incomplete and inconclusive.   According to Mr. Mills, Mr. House could not be excluded as the donor of the DNA inside the third condom, and the enlisted female could not be excluded as the donor of the DNA on the outside of the third condom.

Mr. Harris, Mr. Williams, and Mr. House were tried before a general court-martial convened by the Navy.   Trial proceedings commenced at Naval Support Activity Mid-South, Millington, Tennessee on January 28, 2002 and concluded on January 31, 2002. The Military Judge[1] apparently did not credit all of the enlisted female's allegations, and acquitted Mr. Harris, Mr. House, and Mr. Williams on the charges of rape.   In addition to his acquittal on the rape charge, Mr. Harris was acquitted of violating UCMJ Article 92, 10 U.S.C. § 892 (2000), failure to obey an order or regulation (by wrongfully engaging in an unduly familiar relationship with the enlisted female); one specification of UCMJ Article 81, 10 U.S.C. § 881 (2000), conspiracy to commit indecent acts; and UCMJ Article 134 – General article, 10 U.S.C. § 934 (2000), committing an indecent act.

Mr. Harris, however, was convicted of violating UCMJ Article 133, 10 U.S.C. § 933, conduct unbecoming an officer, for "wrongfully and dishonorably engaging in sexual activities with Yeoman Seaman _____." (omission in original).   He also was convicted of UCMJ Article 81, 10 U.S.C. § 881, conspiracy, involving Mr. Harris, Mr. House, and Mr. Williams, who "each made a false statement to NCIS."   Finally, Mr. Harris was convicted of violating UCMJ Article 107, 10 U.S.C. § 907, making false official statements, and UCMJ Article 125, 10 U.S.C. § 925 (2000), sodomy.   Mr. Harris was sentenced to forfeiture of $1,000.00 in pay and a punitive letter of reprimand.[2]   Mr. Harris' sentence did not include dismissal from the Navy.

---

[1] The Administrative Record before the court indicates that Mr. Harris waived his right to a court-martial panel (military jury).

[2] Mr. House and Mr. Williams were convicted of conduct unbecoming an officer, UCMJ Article 133, 10 U.S.C. § 933 (2000), conspiracy to make a false statement, UCMJ Article 81, 10 U.S.C. § 881, and providing a false statement under oath, UCMJ 107, 10 U.S.C. § 907.   See House v. United States, 99 Fed. Cl. 342, 344 & 344 n.2, reconsideration denied (Fed. Cl. Sept. 15, 2011), appeal filed (Fed. Cir. Nov. 1, 2011).

With respect to the conviction for violation of UCMJ Article 107, 10 U.S.C. § 907, making false official statements, Mr. Harris was found to have stated, in his own words and with intent to deceive, the following to Special Agent Harrison: "I do not know anyone named [the enlisted female]," Mr. Harris saw "the girl" but did not know her name, he and "the girl" immediately went into the bedroom, "the girl" said she was enlisted and he stopped "heading towards" having sex, "LT House and LT Williams came over to check on me," LT House and LT Williams saw or knew Mr. Harris was in his bedroom, and they left, "LT House and LT Williams didn't ever see [the enlisted female]," "I do not know if LT Williams had any type of relationship with [the enlisted female]," "When I spoke with LT Williams on 05 February, [2001,] we did not talk about [the enlisted female].  It was a brief conversation," and, "I did not tell [the enlisted female] that other people would be at the party."   The Military Judge found each of these statements to be false.

On February 21, 2002, Mr. Harris' reporting official, Rear Admiral (RADM) G.E. Voelker, signed Mr. Harris' Fitness Report and Counseling Record covering the period between February 1, 2001 and January 31, 2002.[3]   The report, a standard form, graded Mr. Harris on professional expertise, equal opportunity, military bearing, character, mission accomplishment, initiative, leadership, and tactical performance.   The form concluded by grading Mr. Harris' fitness for promotion.  Although Mr. Harris had, in the past, consistently received the highest of five possible promotion recommendation grades, "early promote," RADM Voelker graded Mr. Harris at the third of the five grades, "promotable."   The comments section in the report lauded Mr. Harris' recruiting work and community involvement, and made no mention of the enlisted female's allegations or the ensuing trial and conviction.

As a result of this evaluation, Mr. Harris wrote a statement of objection for his Navy personnel file.  He maintained that he had never been informed or counseled by his chain of command that his job performance was below standards or lacking in any manner.  He further stated that, on July 27, 2001, at his previous counseling with a superior, Commander Brian Vance, he was told that his performance was outstanding.  Mr. Harris, therefore, stated that any promotion recommendation lower than "early promote" was unjustified.

On December 13, 2002, RADM Voelker, Mr. Harris' reporting official, who was also the General Court-Martial Convening Authority, upheld the sentence adjudged in Mr. Harris' court-martial, but set aside and dismissed the sodomy conviction, UCMJ Article 125, 10 U.S.C. § 925.  In doing so, RADM Voelker cited "the record of trial, the results of trial, the recommendation of the Staff Judge Advocate, and the letters of clemency submitted by the defense counsel and the accused...."   In his letter of clemency to RADM Voelker, Mr. Harris had argued that the conviction for sodomy should be set aside because the only evidence in support of the charge was the enlisted

---

[3] The close-out date for Mr. Harris' Fitness Report was the same date as the date of his court-martial conviction, January 31, 2002.

female's testimony, which the Military Judge "did not...find credible." Plaintiff further argued that the "overwhelming majority of jurisdictions choose not to criminalize...normal bedroom behavior," and, as such, a conviction of sodomy for consensual acts carried an "unfair stigma" that would lead others to interpret Mr. Harris' actions as "far more serious" or "more deviant" than they actually were.

Also on December 13, 2002, RADM Voelker issued a punitive letter of reprimand for Mr. Harris' personnel file, which was part of Mr. Harris' court-martial sentence. The letter of reprimand summarized the course of events that had resulted in Mr. Harris' convictions, and read, in pertinent part: "As a result [of the enlisted female's] allegations of improper sexual acts committed by yourself and the other two officers that night, and based on the subsequent investigation, you were guilty of violating the UCMJ Articles 81 (Conspiracy), 133 (Conduct unbecoming an officer) and 134 (false official statement)."[4] The letter went on, "[y]our misconduct as an officer brought discredit upon the officer corps. Your conduct reflects adversely on the leadership, judgment, and discipline required of you as an officer in the United States Navy. Accordingly, pursuant to references [cited in the letter of reprimand] (b) [Rule for Courts-Martial 1107(f)(4)(G)], (c) [Part II, Manual for Courts-Martial 2000], and (d) [Judge Advocate General Manual 0152], you are reprimanded."

On January 26, 2003, RADM Voelker signed Mr. Harris' Fitness Report and Counseling Record for the period between February 1, 2002, and January 31, 2003. He rated Mr. Harris with the lowest of five possible promotion recommendations, "significant problems." The performance report's comments section included several points lauding Mr. Harris' work on diversity recruiting, but concluded with a summary recitation of Mr. Harris' convictions: "Convicted of [UCMJ] articles 81, 107, 125 and 133 by GCM [general court-martial] on 31JAN02."

In March 2003, the Navy directed Mr. Harris to appear before a Board of Inquiry to show cause why the Navy should retain him. On March 19, 2003, he tendered his request for resignation in lieu of going through the administrative show cause procedures. In doing so, he waived his right to a Board of Inquiry. Pursuant to his request, Mr. Harris separated from the Navy on July 1, 2003, with a general discharge certificate. As a result of his separation, Mr. Harris became ineligible for promotion to Lieutenant Commander.

On July 16, 2003, shortly after Mr. Harris was separated from the Navy on July 1, 2003, RADM Voelker signed Mr. Harris' final Fitness Report and Counseling Record. In that report, RADM Voelker graded Mr. Harris "promotable," the third, and middle, rating of the five possible ratings. The rating was above his previous rating of

---

[4] The letter of reprimand mistakenly cited UCMJ Article 134 – General article, 10 U.S.C. § 934. Mr. Harris was found guilty of violating UCMJ Article 107, 10 U.S.C. § 907 (false official statements). Although numerous offenses can be charged under the UCMJ 134 - General article, the particular UCMJ Article 134 specification with which Mr. Harris was charged, then later acquitted of, dealt with indecent acts.

"significant problems," the lowest of the five ratings.  The report did not mention Mr. Harris' convictions, which had occurred during a prior performance period.

As a matter of course following a general court-martial, the Judge Advocate General of the Navy examined the record of Mr. Harris' trial for error.  See UCMJ Article 69, 10 U.S.C. § 869 (2000).  The Judge Advocate General approved the findings and sentence on September 20, 2004.  Subsequently, however, in December 2004, Mr. Mills, the forensic examiner in Mr. Harris' case, was found to have contaminated DNA samples and falsified DNA test results during his tenure with USACIL.  By letter dated December 30, 2005, the Navy notified Mr. Harris that a deficiency had been found at the USACIL facility and that his court-martial may have been affected.  The government initiated a retest of the evidence that Mr. Mills had examined related to Mr. Harris' court-martial.  The earlier test had not implicated Mr. Harris, but had concluded that the inside of the third condom contained epithelial cells consistent with Mr. House's DNA, although the match was incomplete and inconclusive.  Mr. Mills had concluded that Mr. House could not be excluded as the donor of the DNA in the third condom.  No match to Mr. Harris' DNA had been found on any of the condoms tested by Mr. Mills.  On October 23, 2006, USACIL sent its retest report to the NCIS.  The retest report indicated that the DNA identified on the third condom, which had potentially incriminated Mr. House, included DNA from the enlisted female as well as DNA that belonged, not to Mr. House, but to an unidentified male.  Mr. House, Mr. Harris, and Mr. Williams were all excluded as potential donors of the DNA inside the third condom.  As to the other condoms found at plaintiff's house, the DNA in each instance matched that of the enlisted female, but Mr. Harris, Mr. House, and Mr. Williams were all excluded as potential donors of DNA, and the DNA evidence did not include any of them, even as minor donors.  In May 2009, Mr. Harris was notified of the results of the retest.[5]

In June 2009, Mr. Harris, citing the new evidence, petitioned for a new trial pursuant to UCMJ Article 73, 10 U.S.C. § 873 (2006).  The Deputy Judge Advocate General of the Navy, Vice Admiral (VADM) James W. Houck, conducted the UCMJ Article 73 review.  He concluded that the retested DNA evidence probably would have produced a substantially more favorable outcome for Mr. Harris with respect to the UCMJ Article 133, 10 U.S.C. § 933, charge of conduct unbecoming an officer by "wrongfully engaging in sexual activities in the presence of two other naval officers." VADM Houck further found that the DNA evidence in Mr. Harris' trial was relevant to the UCMJ Article 81, 10 U.S.C. § 881, conspiracy conviction.  VADM Houck concluded that there was no competent evidence in the record to establish each element of the offense beyond a reasonable doubt because the Military Judge at the original court-martial was not specific as to which statements, attributed to Mr. Harris, Mr. House, or Mr. Williams, were "the result of a conspiracy to make a false official statement in violation of Article 81, UCMJ," and the Military Judge had found that the DNA evidence was relevant to the

---

[5]  According to defendant's counsel, the retesting appears to have occurred by November 2006, but, for reasons unexplained in the record, the results were not transmitted to Mr. Harris, Mr. House, or Mr. Williams, or to the Navy (beyond NCIS), until mid-2009.

conspiracy conviction. Accordingly, VADM Houck set aside and dismissed Mr. Harris' convictions as to UCMJ Article 133, 10 U.S.C. § 933, conduct unbecoming an officer, and UCMJ Article 81, 10 U.S.C. § 881, conspiracy.

VADM Houck also examined Mr. Harris' conviction as to UCMJ Article 107, 10 U.S.C. § 907, false official statements, in light of the new evidence. VADM Houck's review stated:

> Turning to the remaining charge, a violation of Article 107, UCMJ, the accused made several statements to the Naval Criminal Investigative Service that were conflicting in some particulars, most significantly, that he did not know the victim or her name. Those statements were refuted by other evidence not related in any way to the DNA evidence. I conclude that the new evidence would not produce a substantially more favorable result for the accused with respect to this offense.

VADM Houck affirmed the Military Judge's finding of guilt regarding Mr. Harris for making false official statements, pursuant to UCMJ Article 107, 10 U.S.C. § 907.

VADM Houck ordered the Navy to modify the punitive letter of reprimand in Mr. Harris' personnel file in order to reflect these changes. The original December 13, 2002 punitive letter of reprimand described the alleged course of events that led to the enlisted female's allegations and stated:

> On or about 31 January 2001, you attended a going away party for a fellow officer at the Helmsmen Complex on board Naval Support Activity Mid-South. Following that party you drove a junior enlisted female Sailor to your home, where you were when two officers from the going away party arrived. As a result [of the enlisted female's] allegations of improper sexual acts committed by yourself and the other two officers that night, and based on the subsequent investigation, you were guilty of violating the UCMJ Articles 81 (Conspiracy), 133 (Conduct unbecoming an officer and gentleman) and 134 (false official statement).

The subsequent punitive letter of reprimand retained the same December 13, 2002 date of the original letter of reprimand, and was identical in language to the earlier letter, except for deletion of violation of UCMJ Articles 81 (conspiracy) and 133 (conduct unbecoming an officer), and the subject, which was "Submission of Corrected Punitive Letter of Reprimand." The earlier, incorrect language citing a violation of UCMJ Article 134 – General article, 10 U.S.C. § 934 was retained and not corrected in the subsequent punitive letter of reprimand. Because Mr. Harris was acquitted of a violation of UCMJ Article 134 – General article, 10 U.S.C. § 934, as in the first letter of reprimand, the second letter should have cited UCMJ Article 107, 10 U.S.C. § 907 (false official statements).

On June 26, 2009, Mr. Harris filed a complaint with this court.[6]  On December 10, 2009, pursuant to an unopposed motion filed by the government, this court stayed proceedings and remanded Mr. Harris' case to the BCNR.  This court instructed the BCNR to consider: (1) Mr. Harris' claim that he was selected for promotion by the selection board; (2) Mr. Harris' claim that he was forced to resign; and (3) any other matters that Mr. Harris presents in writing to the BCNR regarding his separation.

On remand, at the request of the BCNR, Assistant Judge Advocate General (Military Justice) D.M. Harrison prepared an advisory opinion regarding Mr. Harris' case.  Mr. Harrison's advisory opinion was issued on April 8, 2010.  First, Mr. Harrison's advisory opinion considered whether Mr. Harris' Fitness Report and Counseling Record pertaining to the period between February 1, 2002 and January 31, 2003, should be set aside.  The advisory opinion recommended that the Fitness Report and Counseling Record be modified to reflect that the Judge Advocate General had set aside and dismissed the convictions for violating UCMJ Article 81, 10 U.S.C. § 881, conspiracy, and Article 133, 10 U.S.C. § 933, conduct unbecoming an officer.  Second, Mr. Harrison's advisory opinion to the BCNR considered whether the Navy should set aside Mr. Harris' resignation.  Third, the advisory opinion considered whether Mr. Harris should be reinstated as a Lieutenant Commander, with creditable time served.  Mr. Harrison's advisory opinion did not reach conclusions regarding the second and third issues, finding that they were "administrative in nature" and "beyond the scope" of the Office of the Assistant Judge Advocate General (Military Justice).  Finally, the advisory opinion considered whether all references to a general court-martial should be removed from Mr. Harris' record.  The advisory opinion found that such references were appropriate if limited to the conviction for violating UCMJ Article 107, 10 U.S.C. § 907 (false official statements), which VADM Houck had reaffirmed and upheld.

Also, at the request of the BCNR, Steven P. Hester, Assistant Legal Counsel for the Navy Personnel Command, issued an advisory opinion, addressing whether Mr. Harris' resignation should be set aside as involuntary and whether he should be promoted.  Mr. Hester's advisory opinion answered both questions in the negative.  As to Mr. Harris' resignation, Mr. Hester's advisory opinion reasoned that, despite the new DNA evidence and the change in the status of some of Mr. Harris' convictions, Mr. Harris had resigned voluntarily.  The advisory opinion noted that Mr. Harris had elected to tender a voluntary resignation, rather than appear before a Board of Inquiry.  According to Mr. Hester, because Mr. Harris' record reflects a court-martial conviction for violation of UCMJ Article 107, 10 U.S.C. § 907, false official statements, the Navy likely still would have directed Mr. Harris to show cause for retention, and it remained "highly speculative" whether plaintiff would have decided to appear before the Board of

---

[6] Roger A. House also filed a case in the United States Court of Federal Claims, House v. United States, 99 Fed. Cl. 342, requesting promotion to Lieutenant Commander and requesting his retirement pay be adjusted accordingly.  The trial court rejected his claims, and Mr. House has filed a notice of appeal to the United States Court of Appeals for the Federal Circuit.

Inquiry or that a Board of Inquiry would have retained him, given his UCMJ Article 107, 10 U.S.C. § 907, false official statements conviction.  In his advisory opinion, Mr. Hester also explained that Mr. Harris had not presented evidence associated with his Article 107, 10 U.S.C. § 907, false official statements conviction, and because plaintiff had not appeared before a Board of Inquiry, there was no record to review concerning plaintiff's UCMJ Article 107, 10 U.S.C. § 907, conviction.  Mr. Hester's advisory opinion further explained that Mr. Harris' resignation rendered him ineligible for promotion to Lieutenant Commander.  Therefore, according to the Hester advisory opinion, even if Mr. Harris' resignation were to be rescinded, his appropriate rank would be Lieutenant.

Mr. Harris submitted a response to the two advisory opinions.  In his response, he urged the BCNR to set aside his resignation and give him the opportunity to present his case to a separation board for retention in the Navy and reinstatement at the rank of Lieutenant Commander.  Mr. Harris included with his response copies of the City of Memphis Sexual Assault Resource Center's Forensic Nursing Evaluation of the enlisted female and the Memphis Police Department's police report, detailing the January 31, 2001 incident.  He argued that both documents suggest that the enlisted female did not know Mr. Harris' name in January 2001, when Special Agent Beasley interviewed her in February 2001.

In a letter dated August 12, 2010, the BCNR notified Mr. Harris that it had denied his application for correction of his naval records.  The BCNR attached and substantially concurred with the comments contained in Mr. Harrison's and Mr. Hester's advisory opinions.  The BCNR explained that Mr. Harris had resigned voluntarily and that the evidence submitted was insufficient to establish the existence of probable material error or injustice.

## DISCUSSION

"[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued...and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" United States v. Testan, 424 U.S. 392, 399 (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)) (omission in original), reh'g denied, 425 U.S. 957 (1976); see also Inter-Coastal Xpress, Inc. v. United States, 296 F.3d 1357, 1365-66 (Fed. Cir. 2002).  "'[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)); see also Ford Motor Co. v. United States, 635 F.3d 550, 556 (Fed. Cir. 2011) (quoting Arbaugh v. Y & H Corp., 546 U.S. at 514) ("[I]ssues implicating subject matter jurisdiction 'can never be forfeited or waived.'").  "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Hertz Corp. v. Friend, 130 S. Ct. 1181, 1193 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)). In fact, "[s]ubject

matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where, as here, neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir. 2004) (citing Textile Prods., Inc., v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g and en banc suggestion denied (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").  "The objection that a federal court lacks subject-matter jurisdiction…may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011); Griffin v. United States, 96 Fed. Cl. 1, 4 (2010), motion to amend denied (2011).

A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(1), (2) of the Rules of the United States Court of Federal Claims (RCFC) (2011); Fed. R. Civ. P. 8(a)(1), (2) (2011); see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57, 570 (2007)).  "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010).  "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)).  As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' [Bell Atlantic Corp. v. Twombly,] 550 U.S. at 555, 127 S. Ct. 1955.  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. at 1949 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 557).

When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003), Robinson v. United States, 95 Fed. Cl. 480, 483 (2011).

The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained.  See United States v. Navajo Nation, 556 U.S. 287, 129 S. Ct. 1547, 1551 (2009); United States v. Testan, 424 U.S. at 400; see also Chattler v. United States, 632 F.3d 1324, 1130 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act.  The claim must be one for money damages against the United States…."  United States v. Mitchell, 463 U.S. 206, 216 (1983); see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must...identify a substantive source of law that creates the right to recovery of money damages against the United States.").  In Ontario Power Generation, Inc. v. United States, 369 F.3d 1298 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims.  The court wrote:

> The underlying monetary claims are of three types….   First, claims alleging the existence of a contract between the plaintiff and the

government fall within the Tucker Act's waiver....   Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum."   Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)))…. Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007.  Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also Testan, 424 U.S. at 401-02, 96 S. Ct. 948 ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself...can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d at 1301.

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. 287, 129 S. Ct. at 1552 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 129 S. Ct. 1038 (2009).  The source of law granting monetary relief must be distinct from the Tucker Act itself.  See United States v. Navajo Nation, 556 U.S. 287, 129 S. Ct. at 1551 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts).").  "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009).

Mr. Harris has submitted a claim pursuant to the Tucker Act, 28 U.S.C. § 1491 and the Military Pay Act, 37 U.S.C. § 204 (2006).  The Military Pay Act provides that a member of a uniformed service who is on active duty is "entitled to the basic pay of the pay grade to which assigned…."  37 U.S.C. § 204(a).  The United States Court of Appeals for the Federal Circuit has stated:

> the Military Pay Act has previously been held to be money-mandating. See, e.g., James v. Caldera, 159 F.3d 573, 581 (Fed. Cir. 1998) (stating that 37 U.S.C. § 204 "serves as a money-mandating statute"); In re United States, [463 F.3d 1328 (Fed. Cir. 2006),] 2006 WL 2597835, at *5 (same). That is because § 204 provides that a member of a uniformed service who is on active duty is "entitled to the basic pay of the pay grade to which assigned…."  37 U.S.C. § 204(a) (2000).

Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); see also Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) ("In the context of military discharge cases, the applicable 'money-mandating' statute that is generally invoked is the Military Pay Act, 37 U.S.C. § 204.  In order to bring a military pay case in the Court of Federal Claims, a plaintiff therefore must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge."), cert. denied, 540 U.S. 1177 (2004).  Because Mr. Harris has filed a claim for backpay under the Military Pay Act, this court has subject matter jurisdiction to review at least portions of his claim.

## Promotion to Lieutenant Commander

Mr. Harris claims that the pay grade to which he should be assigned is that of a Lieutenant Commander in the Navy.  Even though Mr. Harris resigned and was separated at the rank of Lieutenant, he claims that the placement of his name on the Navy's promotion list for the rank of Lieutenant Commander has led to his promotion by operation of law.  The government argues, however, that Mr. Harris never was promoted to Lieutenant Commander, and that any claim for backpay should be limited to the pay grade of Lieutenant.  The government has filed a motion to dismiss for lack of subject matter jurisdiction on the basis that Mr. Harris was not promoted by operation of law and that this court lacks jurisdiction to compel his promotion.  The court agrees.

The court notes that, "[i]n general…questions of the fitness of an officer to serve on active duty, and in what capacity the officer should serve, are not for the courts to decide.... [T]he Constitution expressly provides that only the President has the authority to appoint an officer, and thus to take the final step in the promotion process." Lewis v. United States, 458 F.3d 1372, 1377 (Fed. Cir.) (citations omitted), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007).  The United States Court of Appeals for the Federal Circuit has stated that this framework applies equally to the commissioning of officers in the military:

> The actual process followed with respect to senior military officers follows the constitutional design. The President nominates officers from the promotion list provided to him by the military department, and those officers are confirmed by the Senate.  In accordance with the Constitution, the President must then make a public act of appointment for an officer to be promoted.

Dysart v. United States, 369 F.3d 1303, 1312 (Fed. Cir. 2004).

"Three separate actions are ordinarily required for a person to be appointed to office pursuant to this provision: the President's nomination, confirmation by the Senate, and the President's appointment after Senate confirmation."  Dysart v. United States, 369 F.3d at 1306 (citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 155-56 (1803)). First is nomination.  "This is the sole act of the President, and is completely voluntary." Marbury v. Madison, 5 U.S. at 155.  Second is appointment, in which an individual's name is submitted to the Senate for confirmation.  "This is also the act of the President, and is also a voluntary act, though it can only be performed by and with the advice and consent of the senate [sic]."  Id.  Third, and finally, is commission.  "To grant a commission to a person appointed, might perhaps be deemed a duty enjoined by the constitution [sic]. 'He shall,' says that instrument, 'commission all the officers of the United States.'"  Id. at 156.  "In accordance with the Constitution, the President must make a public act of appointment for an officer to be promoted." Dysart v. United States, 369 F.3d at 1312.

To the same effect,

> [t]he President's decision not to appoint is a discretionary act that cannot be reviewed by a court. See, e.g., Marbury, 5 U.S. (1 Cranch) at 165-67. In Marbury, the Court held that it could not review the President's exercise of his appointment power because it is discretionary: "The power of nominating to the senate [sic], and the power of appointing the person nominated, are political powers, to be exercised by the president [sic] according to his own discretion." Id. at 166-67….  The Court [in Dalton v. Specter, 511 U.S. 462 (1994)] held: "Where a statute...commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." Id. at 477. The same is necessarily true where the President is afforded discretion by the Constitution itself. The President's decision here whether or not to exercise his appointment power is discretionary, and we hold that the President cannot be compelled to appoint military officers.

Dysart v. United States, 369 F.3d at 1317 (other citations omitted); see also Orloff v. Willoughby, 345 U.S. 83, 92, reh'g denied, 345 U.S. 931 (1953); Curry v. United States, 221 Ct. Cl. 741, 609 F.2d 980, 983 (1979); Cooper v. United States, 203 Ct. Cl. 300, 303 (1973); and D'Arco v. United States, 194 Ct. Cl. 811, 441 F.2d 1173, 1175 (1971)). "The Constitution contemplates that, after confirmation, the President may refuse to

execute [an] appointment." <u>Dysart v. United States</u>, 369 F.3d at 1316.  However, "[i]f an individual has a 'clear cut legal entitlement' to a position, but subordinate officials in the government misinterpret the Constitution, statutes, or regulations, and improperly decline to recommend that individual for nomination or appointment, redress may be available in the courts….Thus, the courts can review promotion decisions for violations [sic] the Constitution, statutes, or regulations." <u>Lewis v. United States</u>, 458 F.3d at 1377 (footnotes omitted).

In Mr. Harris' case, both the first and second steps in the process were accomplished.  He was nominated and confirmed.  Mr. Harris, however, was not commissioned in the rank of Lieutenant Commander.  Plaintiff has not offered any evidence to suggest that the President made "a public act of appointment" or that plaintiff received a commission, promoting him to the rank of Lieutenant Commander at any time.  <u>See</u> <u>Dysart v. United States</u>, 369 F.3d at 1312.  Mr. Harris, nonetheless, argues that, "[i]t is only necessary that the results of the Senate confirmation be 'spread upon the records of the War Department,'" quoting <u>Bennett v. United States</u>, 19 Ct. Cl. 379, 383 (1884).  Mr. Harris asserts that this court must accept his position, in the absence of "evidence to the contrary."

Mr. Harris' reliance on the 1884 United States Court of Claims case of <u>Bennett v. United States</u>, 19 Ct. Cl. 379, is misplaced, given the prevailing Executive branch practices in 1866 when the events in <u>Bennett</u> took place and the specific facts of the <u>Bennett</u> case.  In <u>Bennett</u>, the President called the officer back to duty in the Army, revoking his resignation, following the officer's voluntary resignation.  Mr. Bennett had resigned as a First Lieutenant.  <u>Id.</u> at 382.  Subsequently, while back on duty, he was promoted to Captain with the consent of the Senate.  The procedure behind his promotion did not involve official commissioning paperwork, but was in line with prevailing Executive branch practices in 1866.  The action of the Senate was recorded in the Executive Branch, War Department.  <u>Id.</u> at 385.  Furthermore, Mr. Bennett had been actively serving in the capacity of his higher rank for some time.  <u>Id.</u> at 382-83. When Army Captain Bennett sued for backpay at the pay grade of Captain, the government argued that he had never received a commission as Captain following his return after his resignation.  The United States Court of Claims found that, "when the President, with the advice and consent of the Senate, by 'an open and unequivocal act,' expresses his will [sic] making an appointment, the appointee is intitled [sic] to the office without a formal commission." <u>Id.</u> at 385; <u>see</u> <u>also</u> <u>Marbury v. Madison</u>, 5 U.S. at 156; <u>Dysart v. United States</u>, 369 F.3d at 1312.  Mr. Harris, however, has offered no evidence to support the conclusion that the President or his representative commissioned Mr. Harris through any "open and unequivocal act."

In addition, Mr. Harris cites to 10 U.S.C. § 624(d)(1)(A) (2000) and 10 U.S.C. § 624(d)(4) to argue that he was promoted to Lieutenant Commander by operation of law six months after the April 21, 2001 date of the Navy letter notifying Mr. Harris of the decision to delay his promotion.  Mr. Harris states that further delay of his promotion is improper and that he should be promoted immediately.  The statute at 10 U.S.C. § 624(d)(1) provides that a promotion may be delayed for various reasons, including that

"(A) sworn charges against the officer have been received by an officer exercising general court-martial jurisdiction over the officer and such charges have not been disposed of…." 10 U.S.C. § 624(d)(1)(A). The statute at 10 U.S.C. § 624(d)(4) addresses when the appointment of an officer may be delayed and states:

> An appointment of an officer may not be delayed under this subsection for more than six months after the date on which the officer would otherwise have been appointed unless the Secretary concerned specifies a further period of delay. An officer's appointment may not be delayed more than 90 days after final action has been taken in any criminal case against such officer in a Federal or State court, more than 90 days after final action has been taken in any court-martial case against such officer, or more than 18 months after the date on which such officer would otherwise have been appointed, whichever is later.

10 U.S.C. § 624(d)(4).

Section 624, however, provides no authority for the judiciary to promote officers the Executive branch has failed, or declined, to promote. The United States Court of Appeals for the Federal Circuit in <u>Dysart v. United States</u> offered an extensive discussion of Section 624. The <u>Dysart</u> opinion addressed the case of a naval officer who was nominated by the President, confirmed by the Senate, and on the promotion list awaiting promotion. The officer's promotion was first delayed, and then the officer was never promoted, due to his "relationship with a woman" not his wife. <u>Dysart v. United States</u>, 369 F.3d at 1308-09. Mr. Dysart also had argued, unsuccessfully, that he was "automatically promoted," or promoted by "operation of law," <u>id.</u> at 1310, and that the delay of his promotion was improper. <u>Id.</u> The government responded, and the Federal Circuit agreed, that "the statute [10 U.S.C. § 624] cannot provide for automatic appointments because the appointment power is entirely within the President's discretion…. The constitutional process allows the President complete discretion in choosing whether or not to appoint an officer. The statute does not and cannot alter that process by providing for automatic appointment." <u>Dysart v. United States</u>, 369 F.3d at 1310-11, 1313. The Federal Circuit in <u>Dysart</u> further explained that Congress, through enacting laws, does not have the authority "to require the President to exercise his appointment power," which would be tantamount to Congress exercising the appointment power. <u>Id.</u> at 1317. "Nor does the judiciary have a role in reviewing such decisions. The President's decision not to appoint is a discretionary act that cannot be reviewed by a court." <u>Id.</u>; <u>see also</u> <u>Lewis v. United States</u>, 458 F.3d at 1377 (citing <u>Smith v. Sec'y of the Army</u>, 384 F.3d 1288, 1294-95 (Fed. Cir. 2004)). In <u>Lewis</u>, the Federal Circuit stated: "The premise of Lewis' argument is the same as Dysart's – that [10 U.S.C.] section 624 provides for automatic appointment. We rejected this premise in <u>Dysart</u>, and decline to revisit it now." <u>Lewis v. United States</u>, 458 F.3d at 1379.

The promotion process for Mr. Harris was never completed, since neither the President nor his designee had committed any public act to complete the process, and the process could not be completed by operation of law pursuant to 10 U.S.C. § 624. The government's motion to dismiss for lack of subject matter jurisdiction regarding

plaintiff's claims for promotion to the rank of Lieutenant Commander is granted. Even if Mr. Harris were entitled to backpay, his claim would have to be assessed at the rank of Lieutenant, which was the last rank he had held prior to his separation from the Navy in July 2003.

## The UCMJ Article 107 Conviction and Sentence

Plaintiff's complaint seeks to set aside his remaining court-martial conviction for making false official statements to Navy criminal investigators, in violation of UCMJ Article 107, 10 U.S.C. § 907, and return of the $1,000.00 pay forfeited. Article 76 of the UCMJ, 10 U.S.C. § 876 (2006), states that the findings and sentences of courts-martial, as reviewed and approved, are binding on all courts. Nevertheless, the United States Supreme Court, in United States v. Augenblick, 393 U.S. 348 (1969), addressed a constitutional challenge in which former service members sought backpay after their court-martial convictions. See id. at 348-49. The Supreme Court stated: "apart from trials conducted in violation of express constitutional mandates, a constitutionally unfair trial takes place only where the barriers and safeguards are so relaxed or forgotten…that the proceeding is more a spectacle trial by ordeal than a disciplined contest." Id. at 356 (citations omitted).

The United States Court of Appeals for the Federal Circuit in Matias v. United States, similarly, stated that:

> We have long honored the rule that "judgments by courts-martial, although not subject to direct review by federal civil courts, may nevertheless be subject to narrow collateral attack in such courts on constitutional grounds" when traditional Tucker Act jurisdiction is present. Bowling v. United States, 713 F.2d 1558, 1560 (Fed. Cir. 1983); see also Gearinger v. United States, 188 Ct. Cl. 512, 412 F.2d 862, 864 (Fed. Cir. 1969) (recognizing jurisdiction in the Court of Claims to hear collateral attacks on court-martial convictions).
>
> .  .  .
>
> In order to prevail below, Matias was required to "demonstrate convincingly that in the court-martial proceedings there has been such a deprivation of fundamental fairness as to impair due process." Bowling v. United States, 713 F.2d 1558, 1561 (Fed. Cir. 1983); see also United States v. Augenblick, 393 U.S. 348, 356 (1969).

Matias v. United States, 923 F.2d 821, 823, 826 (Fed. Cir. 1990); see also Ragard v. United States, 439 F.3d 1378, 1380 (Fed. Cir.) (affirming the Court of Federal Claims' jurisdiction to collaterally review a court-martial), cert. denied, 549 U.S. 819 (2006); Tindle v. United States, 56 Fed. Cl. 337, 342 (2003).

Plaintiff argues that the USACIL crime laboratory technician who performed the DNA test results, tainted "the entire investigative, trial, and post-trial process…." Plaintiff states:

> To say that the Board [BCNR] did not act arbitrarily when faced with such compelling evidence is simply unconscionable…. [D]ue to the tainted evidence presented against him [Mr. Harris] at trial, the entire proceedings must be set aside as fundamentally unfair.  To separate one remaining charge out from the rest and say it was free from taint is impossible, and infringes on Plaintiff's due process rights.  The entire legal and factual landscape has changed, and as such, Plaintiff should have the entire proceedings set aside.

At his court-martial, Mr. Harris was acquitted of several charges: rape, violating a lawful general regulation (by wrongfully engaging in an unduly familiar relationship with the enlisted female), conspiracy to commit indecent acts, and committing an indecent act.  His DNA was not identified on any of the condoms originally tested and a rape kit test of the female involved in the January 31, 2001 incident did not identify any semen or signs of physical injury.  Mr. Harris, however, was convicted of conduct unbecoming an officer, of conspiring with Lieutenants House and Williams on false official statements, of making false official statements, and sodomy.  The General Court-Martial Convening Authority set aside the sodomy conviction prior to the discovery of the faulty laboratory DNA test results.  After discovery of the tainted DNA evidence, the Office of the Navy Judge Advocate General reviewed the plaintiff's court-martial convictions, and dismissed the conspiracy, UCMJ Article 81, 10 U.S.C. § 881 and conduct unbecoming an officer, UCMJ Article 133, 10 U.S.C. § 933 convictions against Mr. Harris.  Mr. Harris, however, remains convicted of UCMJ Article 107, 10 U.S.C. § 907, false official statements, a conviction independent of, and not based on, the results of any tainted crime laboratory analysis.

The Navy Judge Advocate General's review, performed by VADM Houck, stated that:

> The difference between the new DNA evidence and the DNA evidence presented at trial is significant and I conclude that this evidence would probably produce a substantially more favorable outcome for the accused with respect to the charge of violating Article 133, UCMJ [10 U.S.C. § 933, conduct unbecoming an officer], by wrongfully engaging in sexual activities in the presence of two other naval officers.
>
> · · ·
>
> While the summarized record of trial reflects that the government presented evidence of a number of statements that each accused made to NCIS [Naval Criminal Investigative Service], it is impossible to determine which of these specific statements the judge concluded was made as a

result of the alleged conspiracy [UCMJ Article 81].  Moreover, the military judge…noted that the DNA evidence discussed above was relevant to the conspiracy charge.  Consequently, there is no competent evidence in the record to establish each element of the offense beyond a reasonable doubt.  Edmond v. United States, 520 U.S. 651, 665 (1997) (citing United States v. Wilson, 6 M.J. 214 (C.M.A. 1979)).

VADM Houck then addressed Mr. Harris' UCMJ Article 107, 10 U.S.C. § 907 conviction, false official statements to the Navy criminal investigators, and found the charge, and conviction, to be unrelated to the tainted DNA evidence:

> Turning to the remaining charge, a violation of Article 107, UCMJ, the accused made several statements to the Naval Criminal Investigative Service that were conflicting in some particulars, most significantly, that he did not know the victim or her name.  Those statements were refuted by other evidence not related in any way to the DNA evidence. I conclude that the new evidence would not produce a substantially more favorable result for the accused with respect to this offense.

It is not appropriate for this court to retry Mr. Harris' court-martial.  As the United States Court of Appeals for the Federal Circuit stated in Bowling v. United States, with respect to a civil court's review of a military court-martial, "it is not the duty of the civil courts simply to repeat that process—to reexamine and reweigh each item of evidence…. It is the limited function of the civil courts to determine whether the military have [sic] given fair consideration to each of these claims."  Bowling v. United States, 713 F.2d at 1561 (citing Burns v. Wilson, 346 U.S. 137, 144, reh'g denied (1953)).  The Federal Circuit continued:

> Our own precedents hold that questions of fact resolved by military courts cannot be collaterally attacked.  See, e.g., Flute v. United States, 535 F.2d 624, 626 (Ct. Cl. 1976).  This court will not reweigh the evidence presented at plaintiff's court-martial in order that it might substitute its judgment for that of the military trial court.  Artis v. United States, 506 F.2d 1387, 1391 (Ct. Cl. 1974); Taylor v. United States, 199 Ct. Cl. 171 (1972).

Bowling v. United States, 713 F.2d at 1561; see also Matias v. United States, 923 F.2d at 826.  When reviewed in their totality, the Navy legal proceedings reflect basic fairness.  The Navy acted to remedy the effects of the crime laboratory technician's faulty DNA testing procedures.  The appropriate convictions of Mr. Harris, as well as of Mr. House and Mr. Williams, all of whom were involved in the events of January 31, 2001, were set aside.  Moreover, as explained in Mr. Hester's advisory opinion, not only did plaintiff not present his version of the events to a Board of Inquiry, including regarding his conviction for false official statements, UCMJ Article 107, 10 U.S.C. § 907, leaving no record to review on that issue, but that conviction was independent of and not based on the results of any faulty laboratory procedures.  This court declines to substitute its judgment for that of the military in a situation in which reasonable steps

were taken, and appropriate offenses were dismissed to account for the potential influence on plaintiff's convictions by any of the tainted DNA evidence.  The court finds that the BCNR's review, reasoning and conclusions were reasonable and neither arbitrary nor capricious.

## Voluntary Resignation

The defendant also filed a motion to dismiss Mr. Harris' complaint in part for failure to state a claim, arguing that Mr. Harris' resignation was voluntary and that Mr. Harris, therefore, is not entitled to backpay or promotion.  The government suggests that "Mr. Harris resigned instead of appearing before a Board of Inquiry to show cause for why the Navy should retain him.  In other words, he resigned in order to avoid the possibility that the Board of Inquiry would determine that he should be dishonorably discharged from the Navy."  Mr. Harris states that he did not resign under conditions constituting coercion or duress.  Instead, he alleges that false or misleading information compelled his resignation, rendering it involuntary.  Plaintiff argues "no one knew" that the DNA results were false, he "relied on it to his detriment," and that "[t]he entire playing field would have been different if the facts available now were available before, during, or immediately following his court-martial."  Plaintiff alleges that the incorrect information, through its effect on plaintiff's court-martial convictions, played a major role in his decision to resign from the Navy.  Mr. Harris also states that he resigned because he believed that he was no longer promotable.

Resolution of the majority of plaintiff's claims depends on whether his resignation from the Navy was voluntary or involuntary.  In Metz v. United States, 466 F.3d 991, the United States Court of Appeals for the Federal Circuit has stated:

> the issue of the voluntariness of a plaintiff's separation, a necessary requirement for a separated-plaintiff's case to fit within the scope of 37 U.S.C. § 204 [the Military Pay Act], is properly addressed under a Rule 12(b)(6) motion to dismiss and therefore is no longer a jurisdictional requirement appropriately challenged under Rule 12(b)(1).  Therefore, if a plaintiff cannot establish that he is currently on active duty, he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of § 204, or else his claim falls [sic] for failure to state a claim upon which relief can be granted.

Metz v. United States, 466 F.3d at 998.

In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief."  RCFC 8(a)(2); Fed. R. Civ. P. 8(a)(2); see also Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  The United States Supreme Court, in the Twombly case, stated that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002) ("Rule 12(b)(6) does not countenance...dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely")....[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atlantic Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; brackets and omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. at 1949-50 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 555-57, 570); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 131 S. Ct. 92 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 130 S. Ct. 3468 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 129 S. Ct. 2878 (2009); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010); Legal Aid Soc'y of New York v. United States, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010).

When deciding on a motion to dismiss based on failure to state a claim upon which relief can be granted, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Cambridge v. United States, 558 F.3d at 1335 (citing Papasan v. Allain, 478

U.S. at 283); Cary v. United States, 552 F.3d at 1376 (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); Anaheim Gardens v. United States, 444 F.3d 1309, 1315 (Fed. Cir.), reh'g denied (Fed. Cir. 2006); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000); Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). If a defendant or the court challenges jurisdiction or a plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). "A motion to dismiss under Rule [12(b)(6)] for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy." Perez v. United States, 156 F.3d at 1370.

Because Mr. Harris is not currently on active military duty, in order to state a claim upon which relief can be granted under the Military Pay Act, 37 U.S.C. § 204, he "must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of [37 U.S.C.] § 204, or else his claim falls for failure to state a claim upon which relief can be granted." Metz v. United States, 466 F.3d at 998. In an affidavit attached to plaintiff's cross-motion for judgment upon the Administrative Record, Mr. Harris states, in his own words, that:

> At the time of my resignation, I fully believed I would not have any opportunity for further promotion in the Navy. The last fitness report I received before leaving active duty marked "significant problems" as my promotion potential, rendering my future in the Navy futile.  This fitness report was based on my conviction of three charges, and would have been much different had the facts now available to this Court been available to my command. (citation omitted).

The brief filed on behalf of the plaintiff expanded on Mr. Harris' rationale for resigning, as follows:

> He had been wrongfully convicted at a court-martial of multiple charges. At that point no one knew that the DNA expert at trial was allowing cross-contamination and falsifying results.  No one knew that the DNA results actually exonerated all three accused.  No one knew that their convictions would be overturned.  LT Harris's promotion date had passed, and he believed that his name had been removed from the promotion list. He was no longer even recommended for promotion because his Commanding Officer selected "significant problems" on his January 2003 fitness report. Since he was no longer even "promotable" further promotion was impossible.  By the end of the fiscal year, things were looking bleak as far as his future in the Navy.  He was depressed over the conviction[s].  He was a single father of three children, and based on the misleading

information he was presented with, he took the only reasonable alternative open to him based on advice given to him by his peers and superiors. This choice was reasonable in light of the totality of the circumstances.

The fact of the matter remains, however, that this information was false and misleading, and Mr. Harris relied on it to his detriment.  The entire playing field would have been different if the facts available now were available before, during, or immediately following his court-martial.

. . .

Mr. Harris's resignation must be considered involuntary, given the new evidence that has come to light post-trial.

A decision to resign from government service is presumed to be voluntary.  See Carmichael v. United States, 298 F.3d 1367, 1372 (Fed. Cir. 2002) (in a military personnel case, the Federal Circuit addressed the presumption: "A presumption of voluntariness generally exists where an employee tenders his resignation or retires; the plaintiff bears the burden of coming forward with evidence to demonstrate that his resignation or retirement was not voluntary.") (citations omitted); see also Christie v. United States, 207 Ct. Cl. 333, 338, 518 F.2d 584, 587 (1975) (in a civilian personnel case, the United States Court of Claims stated: "[e]mployee resignations are presumed to be voluntary."); Lopez-Velazquez v. United States, 85 Fed. Cl. 114, 136 (2008); Moody v. United States, 58 Fed. Cl. 522, 524 (2003); Gavin v. United States, 47 Fed. Cl. 486, 490 (2000), appeal dismissed, 25 F. App'x 882 (Fed. Cir. 2001).

However, a "[p]laintiff can thus rebut the presumption that his resignation was voluntary if he can show that he resigned as a result of wrongful government action. Roskos v. United States, 213 Ct. Cl. 34, 40, 549 F.2d 1386 (1977) ('An action is not voluntary if it is produced by government conduct which is wrongful.')."  Sinclair v. United States, 66 Fed. Cl. 487, 492 (2005), aff'd, 192 F. App'x 966 (Fed. Cir. 2006); see also Carmichael v. United States, 298 F.3d at 1372 (holding that an otherwise voluntary discharge may be rendered involuntary if it is obtained as a result of wrongful government action such as duress or coercion); Moyer v. United States, 190 F.3d 1314, 1320 (Fed. Cir. 1999) (noting that a resignation is presumed to be voluntary, but voluntariness can be rebutted by a showing of government misrepresentation or deception).

There are various, albeit similar, formulations of the test to demonstrate that a resignation was involuntary.   For example, in Garcia v. Department of Homeland Security, the United States Court of Appeals for the Federal Circuit stated:

"[T]o establish involuntariness on the basis of coercion this court requires an employee to show: (1) the agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic

alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency."

Garcia v. Dep't of Homeland Sec., 437 F.3d at 1329 (quoting Shoaf v. Dep't of Agric., 260 F.3d 1336, 1341 (Fed. Cir. 2001) (citing Christie v. United States, 207 Ct. Cl. at 337-38, 518 F.2d at 587)) (other citations omitted).

To the same effect, in Sinclair v. United States, a Judge of the Court of Federal Claims explained:

> Decisions of the Federal Circuit and the Court of Claims, both of which are binding on this court, have held that a resignation is involuntary if it is caused by any of the three causes that Plaintiff alleges: (1) government duress or coercion, Christie, 518 F.2d at 587; (2) mental incompetence (or, as Plaintiff alleges, emotional strain), Manzi v. United States, 198 Ct. Cl. 489, 492 (1972); or (3) government deception or misrepresentation (or, as Plaintiff claims, ineffective assistance of counsel), Tippett [v. United States,] 185 F.3d [1250,] 1255 [(1999)].

Sinclair v. United States, 66 Fed. Cl. at 492 (footnote omitted); see also Gallucci v. United States, 41 Fed. Cl. 631, 638 (1998) ("To defeat the presumption of voluntariness the plaintiff must show facts and circumstances demonstrating that the resignation was either: (1) secured through duress or coercion; (2) submitted under time pressure; (3) obtained via an intentional misrepresentation by the government upon which plaintiff relied to his detriment; or (4) secured under circumstances in which plaintiff failed to understand the situation due to mental incompetence." (citing Christie v. United States, 207 Ct. Cl. at 338, 518 F.2d at 587; Perlman v. United States, 203 Ct. Cl. 397, 490 F.2d 928 (1974); and Bergman v. United States, 28 Fed. Cl. 580 (1993)).[7]

The court notes that Mr. House, the former Navy officer who, along with Mr. Williams and plaintiff Mr. Harris, were implicated in the January 31, 2001 incident, also filed a complaint in the United States Court of Federal Claims, seeking retroactive promotion to Lieutenant Commander, asking that his Navy retirement pay be adjusted and that the $1,000.00 forfeiture of pay imposed on him be reversed. See House v. United States, 99 Fed. Cl. at 346. Mr. House had been convicted in a general court-martial of conduct unbecoming of an officer, UCMJ Article 133, 10 U.S.C. § 933, conspiracy to make a false statement, UCMJ Article 81, 10 U.S.C. § 881, and providing a false statement under oath, UCMJ Article 107, 10 U.S.C. § 907 (the conviction for

---

[7] In Lynn v. United States, 58 Fed. Cl. 797, 804 (2003), the court wrote: "Beginning with Sammt, the Federal Circuit recognized the similarity of the involuntariness analysis of civilian personnel separations, such as that used in Covington, to military personnel separations. See Sammt [v. United States], 780 F.2d 31, 32 (Fed. Cir. 1985) ('[W]e conclude, as we have in civilian pay cases, that the exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative.'" (citing Covington v. Dep't of Health and Human Servs., 750 F.2d 937, 942 (Fed. Cir. 1984))).

providing a false statement was set aside before the faulty DNA testing surfaced).  Id. at 344-45.  Mr. House was ordered to forfeit $1,000.00 in pay, and was issued a letter of reprimand.  Id. at 345.  A Navy promotion board, nevertheless, recommended Mr. House's promotion to Lieutenant Commander.  Id. at 344.  Given the court-martial, Mr. House's selection for promotion was not acted on, but was taken under consideration.  Id.  Mr. House then met a Board of Inquiry, which, by a vote of 2-1, recommended his retention in the Navy.  Id. at 345.  Nevertheless, believing that his career was effectively finished, and eligible for retirement, Mr. House retired from the Navy, in the rank of Lieutenant, on October 1, 2003.  Id.  When he retired, his selection for promotion to Lieutenant Commander was still under review.  Id. at 348, 354.  As a result of retesting the faulty DNA results, which previously had not excluded Mr. House as a potential donor on the third condom, Mr. House's convictions were set aside.  Id. at 345.  The BCNR removed any references to his court-martial from Mr. House's records.  Id.  The Board, however, found that he had voluntarily retired from the Navy, and denied his request for retroactive promotion to Lieutenant Commander.  Id. at 346, 348 n.8.

The Court of Federal Claims Judge in House considered whether the faulty DNA testing and resulting convictions rendered Mr. House's retirement involuntary and whether Mr. House was effectively left with no practicable alternative other than to retire.  Id. at 348-52.  Even though the House court acknowledged that Mr. House's retirement decision "was influenced heavily by [the faulty DNA testing] taken on behalf of the military that proved wrongful," id. at 348, because a Board of Inquiry had recommended his retention in the Navy, and his selection for promotion by a Navy Board was still under review, the court found that Mr. House had a realistic option other than retirement.  Id.  The court, therefore, found that the BCNR had reasonably concluded Mr. House's retirement was voluntary and not coerced.  Id. at 352.

Unlike Mr. Harris, all of Mr. House's convictions were set aside by the Navy.  See Id. at 345 & 345 n.4.  Mr. Harris, however, remains convicted of making false official statements to Navy investigators.  Moreover, no potential DNA match to Mr. Harris was identified on the first testing, which could have been put in question by the deficiencies at the USACIL facility.  Although neither Mr. Harris' nor Mr. House's convictions included separation from the Navy, Mr. House chose to meet a Board of Inquiry to show cause why he should be retained in the Navy, and he was recommended for retention. In contrast, Mr. Harris chose not to meet the Board of Inquiry and opted to resign from the Navy, rather than have his record reviewed by a Board of Inquiry.

Plaintiff Harris attempts to rely on the opinions in Scharf v. Department of the Air Force, 710 F.2d 1572 (Fed. Cir. 1983) and Covington v. Department of Health and Human Services, 750 F.2d 937, both civilian personnel cases on appeal from the Merit Systems Protection Board.  In Scharf, the Federal Circuit found plaintiff's retirement involuntary based on erroneous advice given by the agency about his retirement options.  Id. at 1573-74.  The Scharf court stated:

> To determine whether a resignation or retirement is voluntary, a court must examine "the surrounding circumstances to test the ability of the

employee to exercise free choice." <u>Perlman v. United States</u>, 203 Ct. Cl. 397, 490 F.2d 928, 933 (1974).

. . .

An employee is not required to show an intent to deceive on the part of the agency in order for his retirement to be held involuntary. Rather, it is sufficient if the employee shows that a reasonable person would have been misled by the agency's statements. We have in the past applied an objective test in situations involving duress or coercion, <u>see</u> <u>Christie</u>, 518 F.2d at 587. We believe that an objective test is equally applicable to situations involving misrepresentations or deception. Applying this test, the court will neither inquire into the subjective perceptions of the employee, <u>see</u> <u>Taylor</u> [v. United States, 219 Ct. Cl. 86,] 591 F.2d [688,] 692 [(1979)], nor the subjective intentions of the agency.

<u>Scharf v. Dep't of the Air Force</u>, 710 F.2d at 1574-75 (footnote omitted).

In <u>Covington</u>, a civilian employee's retirement was deemed involuntary due to inaccurate information as to Mr. Covington's employment options in a Reduction in Force notice. <u>Id.</u> at 942. In <u>Covington</u>, the court stated:

The fact that an employee is faced with an inherently unpleasant situation or that his choice is limited to two unpleasant alternatives does not make an employee's decision any less voluntary. <u>Taylor v. United States</u>, 219 Ct. Cl. 86, 92, 591 F.2d 688, 692 (1979). But the decision must ultimately be the employee's decision, not the government's; whether the employee made an informed choice is the touchstone of our analysis.

. . .

Unlike a retirement which is induced through duress, there is no requirement that an employee be intentionally deceived about his employment options, it being sufficient that "the employee shows that a reasonable person would have been misled by the agency's statements." <u>Scharf</u>, 710 F.2d at 1575. The misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary.

. . .

But the law also requires that a choice between two alternatives, however unpleasant, must be understood by the employee and that such a decision be freely made. In this case, the agency was responsible for Covington's lack of an informed choice. A decision made "with blinders on," based on

misinformation or a lack of information, cannot be binding as a matter of fundamental fairness and due process.

Covington v. Dep't of Health and Human Servs., 750 F.2d at 942-43 (citation omitted); see also Lynn v. United States, 58 Fed. Cl. at 802-03 (discussing the Sharf and Covington cases); Kim v. United States, 47 Fed. Cl. 493, 501 (2000) (discussing the Covington case).

Neither the Scharf or Covington cases aid the plaintiff.  In the present case, Mr. Harris has not expressly argued deception, or intentional misrepresentation on the part of the government. Moreover, the Administrative Record reflects that after the Navy learned that the DNA laboratory test results were erroneous, the Navy notified plaintiff, as well as Mr. House and Mr. Williams, of the erroneous results, retested the DNA on its own initiative, notified plaintiff of the retested results and vacated those convictions which might have been derived, even remotely, from the faulty DNA testing.  The record reflects that the government took corrective actions.  Moreover, plaintiff's conviction for violation of UCMJ Article 107, 10 U.S.C. § 907, false official statements, was reviewed and determined by VADM Houck to be unrelated to the evidence derived from the DNA testing.

To have an actionable claim, Mr. Harris reasonably must have relied on government misinformation.  See Covington v. Dep't of Health and Human Servs., 750 F.2d at 942; Scharf v. Dep't of the Air Force, 710 F.2d at 1575; Christie v. United States, 207 Ct. Cl. at 339, 518 F.2d at 588; Lynn v. United States, 58 Fed. Cl. at 805-06 (citing Covington v. Dep't of Health and Human Servs., 750 F.2d at 942).  Unlike Mr. Harris, the plaintiffs in Scharf and Covington were found by the Court of Appeals for the Federal Circuit to have relied on information from government employees who held themselves out to be experts on retirement and who gave them each faulty information. See Scharf v. Dep't of the Air Force, 710 F.2d at 1575 ("A reasonable person would certainly have concluded from the advice received that there would be no adverse consequences if an optional retirement preceded a disability retirement.  Furthermore, it was reasonable for petitioner to rely on the advice of his retirement counselor, and he did in fact rely on this advice in good faith."); see also Covington v. Dep't of Health and Human Servs., 750 F.2d at 942 ("We hold that the August 21, 1981 [Reduction in Force] notice was misleading and erroneous in material ways.  The notice stated, without qualification, that the agency was going to be abolished and that Covington had no right of assignment to another position.  A person in this situation could reasonably rely upon the government's statement that he would have no opportunity to be reassigned, and Covington did so rely.").

Although Mr. Harris argues that when he decided to resign, he relied on faulty information and his record of convictions, unlike Mr. Scharf and Mr. Covington, plaintiff was the expert and fully informed on what had actually happened in his home on the critical night of January 31, 2001.  See Gaudette v. Dep't of Transp., 832 F.2d 1256, 1258 (Fed. Cir. 1987) (petitioners who were reassigned to lower-graded positions claimed to have been "involuntarily demoted," but the Federal Circuit found that,

"[p]etitioners knew as much as the agency concerning their future if they did not elect to transfer," and found the demotions to be voluntary); Petrick v. United States, 12 Cl. Ct. 700, 703 (1987) (the court concluded that plaintiff Petrick's separation from the military was voluntary, noting that "here plaintiff was a competent personnel specialist who knew the rules."). Also, significantly, the conviction for false statements made by Mr. Harris during the investigation was unrelated to the DNA testing, and was not overturned.

Plaintiff also argues that he resigned because he was "depressed," he believed he was not promotable, "things were looking bleak as far as his future in the Navy," and "he took the only reasonable alternative open to him…." Plaintiff points to a letter from the Navy, which ordered him "to show cause for retention in naval service before a Board of Inquiry (BOI)," and also stated: "The approved findings of guilt from the Respondent's Court-Martial are binding on the Board [of Inquiry]."

Mr. Harris may have decided to resign, feeling that he had no other alternative, but he did have an alternative, to remain in the Navy and face a Board of Inquiry. Mr. Harris had the opportunity to present his case for retention to the Board of Inquiry. Plaintiff's court-martial sentence did not include dismissal, and he was not separated from the Navy as a result of his convictions. Applicable to the plaintiff's case, the Federal Circuit stated in Garcia:

> For example, in Christie, our predecessor court held that "[w]hile it is possible plaintiff, herself [Ms. Christie], perceived no viable alternative but to tender her resignation, the record evidence supports CSC's [the Civil Service Commission] finding that plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff *had a choice*. She could stand pat and fight. She chose not to."

Garcia v. Dep't of Homeland Sec., 437 F.3d at 1329 (quoting Christie v. United States, 207 Ct. Cl. at 338, 518 F.2d at 587) (emphasis in original); see also Parrott v. Merit Sys. Prot. Bd., 519 F.3d 1328, 1335 (Fed. Cir. 2008) ("[A] choice is not involuntary simply because an employee is faced with an inherently unpleasant situation or his choice is limited to two unpleasant alternatives." (quoting Terban v. Dep't of Energy, 216 F.3d 1021, 1026 (Fed. Cir.), reh'g denied (Fed. Cir. 2000) (citing Covington v. Dep't of Health and Human Servs., 750 F.2d at 942))); Dorrall v. Dep't of the Army, 301 F.3d 1375, 1381 (Fed. Cir. 2002); Schultz v. United States Navy, 810 F.2d 1133, 1136-37 (Fed. Cir. 1987); Sammt v. United States, 780 F.2d at 32 ("[T]he exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative." (citing Griessenauer v. Dep't of Energy, 754 F.2d 361, 364 (Fed. Cir. 1985))); Christie v. United States, 207 Ct. Cl. at 338, 518 F.2d at 587 ("Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation."). Plaintiff Harris is unable to demonstrate and cites to no documents in the Administrative Record

which prove that he was under duress or coerced into resigning, or that coercive acts on the part of the government left him with no realistic alternative but to resign.

Mr. Harris' resignation letter stated in part:

I am tendering my request for resignation in lieu of administrative show cause procedures.... I hereby submit my resignation from the Naval Service of the United States, and request that it be accepted.  I have been informed and understand that if my resignation herein submitted is accepted, I shall subsequently receive a certificate of general discharge from the Naval Service, that such separation, although considered by the Navy Department to be under honorable conditions, is not the highest qualitative type of separation provided for officers of the Naval Service….

Although plaintiff claims that he would have appeared before a Board of Inquiry had the faulty DNA procedures come to light earlier, the DNA evidence pointed only to Mr. House, not to Mr. Harris, as a possible DNA donor on the condom found by the NCIS investigators.  The events on January 31, 2001 took place in plaintiff's home and he was present.  Even after some of the convictions (conduct unbecoming an officer, UCMJ Article 133, 10 U.S.C. § 933 and conspiracy to make a false statement, UCMJ Article 81, 10 U.S.C. § 881) were reversed and cleared from plaintiff's record, Mr. Harris remains convicted of UCMJ Article 107, 10 U.S.C. § 907, making false official statements.  Moreover, Mr. Harris does not argue, nor has he submitted evidence to substantiate, that he was misinformed or misled as to the effects and consequences of a voluntary resignation.  He has not alleged coercion or duress on the part of the government.  He was in the best position and was competent to assess the possible consequences of his behavior before a Board of Inquiry.

Mr. Harris understood his options of the admittedly unpleasant alternatives.  Given that choice, he chose to voluntarily resign.  The record demonstrates that Mr. Harris affirmatively exercised a choice to resign.  The Navy did not misinform Mr. Harris about his options, or the implications of those options.  His choices were clear to him. He could have met a Board of Inquiry and attempted to show cause why he should not be involuntarily discharged from the Navy, with a potential "Other than Honorable Conditions" characterization of his Navy service, or he could resign in lieu of meeting a Board of Inquiry, and accept a general discharge certificate, a characterization of discharge under honorable conditions.  He chose the latter option.  See Sinclair v. United States, 66 Fed. Cl. at 495 (concluding that his resignation was voluntary, the court noted that "[p]laintiff stated in his resignation memorandum that he 'fully under[stood] the implications of [his resignation]' and had been 'fully advised and counseled' regarding his options.") (alterations in original); see also Lynn v. United States, 58 Fed. Cl. at 804 (citing Covington v. Dep't of Health and Human Servs., 750 F.2d at 942).

**The Board for Correction of Naval Records**

After plaintiff filed a complaint in this court, the government filed an unopposed motion to remand this case to the BCNR.  The court, therefore, remanded to the Board to consider three issues: (1) Mr. Harris' claim that he was selected for promotion by the selection board; (2) Mr. Harris' claim that he was forced to resign; and (3) any other matters that Mr. Harris presents in writing to the BCNR regarding his separation.  After review, the BCNR concluded that Mr. Harris' resignation was voluntary.   As a result of the BCNR review, the court reviews the BCNR's decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Lewis v. United States, 458 F.3d at 1376 (citing Martinez v. United States, 333 F.3d at 1305, 1314); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."); Metz v. United States, 466 F.3d at 998; Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983); Skinner v. United States, 219 Ct. Cl. 322, 331, 594 F.2d 824, 830 (1979); Riser v. United States, 97 Fed. Cl. 679, 683-84 (2011) (the court noted that plaintiff must show that the decision by Army Board for Correction of Military Records was arbitrary and capricious, contrary to law, or unsupported by substantial evidence, and that, in accordance with this deferential standard of review, the court does not reweigh the evidence, "but rather considers 'whether *the conclusion being reviewed* is supported by substantial evidence.' Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983).  So long as the Board considered the relevant evidence and came to a reasonable conclusion, this court will not disturb the Board's decision.") (emphasis in original; other citations omitted).

This standard of review is narrow.  The court does not sit as "a super correction board." Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830.  Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir.), reh'g denied (Fed. Cir. 1993).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight

System, Inc., 419 U.S. [281,] 286 [(1974)]. See also Camp v. Pitts, 411 U.S. 138, 142-143 (1973) (per curiam).

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983) (other citations omitted).

Although some of the charges and convictions against plaintiff, specifically UCMJ Article 133, 10 U.S.C. § 933, conduct unbecoming an officer, and UCMJ Article 81, 10 U.S.C. § 881, conspiracy, were set aside, Mr. Harris' conviction for making false official statements, UCMJ Article 107, 10 U.S.C. § 907, remains on his record, even in light of the retesting of the DNA evidence. The faulty DNA testing was not implicated in plaintiff's false official statements made to NCIS investigators and his subsequent conviction. VADM Houck, in reassessing Mr. Harris' convictions, stated, "the new evidence would not produce a substantially more favorable result to the accused with respect to [UCMJ Article 107, 10 U.S.C. § 907]."

The BCNR decision did not reinstate Mr. Harris because the BCNR concluded his resignation was voluntary. The BCNR found that "the evidence submitted was insufficient to establish the existence of probable material error or injustice." The BCNR concluded that it "substantially concurred with the comments contained in the advisory opinions": the "Comment and Recommended Action," furnished by the Navy Assistant Judge Advocate General (Military Justice), signed by D.M. Harrison, and dated April 8, 2010, and the Navy Personnel Command (Pers-00J1) advisory opinion from Steven P. Hester, dated June 17, 2010, both of which the BCNR enclosed with its decision.

Mr. Hester's advisory opinion, "Request for Comments and Recommendations in the Case of Ex-LT Samuel W. Harris," addressed the voluntariness of Mr. Harris' resignation. According to the Hester advisory opinion, Mr. Harris "elected to tender a voluntary resignation rather than appear before a Board of Inquiry." Mr. Hester pointed out that, "[e]ven with the court-martial conviction relief afforded the Applicant, the Applicant's conviction for an Article 107 [false official statements] violation remains part of his record." Additionally, Mr. Hester's advisory opinion stated:

> Whether Applicant would have made a different election in regard to going before a BOI [Board of Inquiry] is a fair question but one that is highly speculative. Notably, the charge for which Applicant remains convicted casts an unfavorable reflection on his honesty, integrity, and trustworthiness as he lied to a NCIS special agent conducting a criminal investigation. The fact that Applicant did not appear before a BOI means there is no record to review concerning the Article 107 conviction. Moreover, the Applicant does not present in his application to the Board evidence addressing his conduct associated with his Article 107 conviction and why, given this conviction, a BOI would not have recommended Applicant's separation.

The Hester advisory opinion recommended against rescinding Mr. Harris' resignation. The BCNR acted reasonably and did not act arbitrarily or capriciously

when it addressed the voluntariness of Mr. Harris' resignation.  The BCNR adopted the reasoning in Mr. Hester's advisory opinion, which specifically addressed the voluntariness issue and took into account "'substantial evidence on the record considered as a whole,'" <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 44 (quoting S. Rep. No. 89-1301, at 8 (2d Sess. 1966), so that "'the agency's path may reasonably be discerned.'"  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43 (quoting <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys.</u>, 419 U.S. 281, 286 (1974)); <u>see</u> <u>also</u> <u>Lewis v. United States</u>, 458 F.3d at 1376 (stating the arbitrary or capricious standard for board review).  For the reasons discussed above, Mr. Harris' resignation is considered by this court to be voluntary.  Mr. Harris, therefore, has filed a claim upon which relief cannot be granted, and pursuant to RCFC 12(b)(6), plaintiff's claim to set aside his conviction and his resignation must be dismissed.

## Ineffective Assistance of Counsel

Mr. Harris implies in briefs filed on his behalf in this court that his decision to resign may have been based on legal advice that was based on the original DNA evidence and on his convictions that the Navy later set aside.  Plaintiff states that he came to his decision to resign from the Navy after conferring with his legal advisors.  He states: "there is no indication that the recommendations and counseling of his legal advisors and superiors were given with anything but the best interests of LT Harris at heart…. While no duress or coercion was used, plaintiff received well-meaning, which is now known to be false, advice which induced him to resign."  By mentioning the concept of "false advice" from his legal advisors in his briefs to this court, plaintiff raises the specter of an ineffective assistance of counsel argument.  Plaintiff, however, did not make an ineffective assistance of counsel argument to the BCNR, and the BCNR, therefore, did not address any such allegation.    If, however, it was plaintiff's intention to raise an ineffective assistance of counsel claim to this court, the allegation is not persuasive.

Although in the context of a criminal trial, in <u>Strickland v. Washington</u>, the United States Supreme Court, articulated the applicable standard to sustain an ineffective assistance of counsel claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Strickland v. Washington</u>, 466 U.S. 668, 687, <u>reh'g</u> <u>denied</u>, 467 U.S. 1267 (1984).  A more recent United States Supreme Court case relied on and expanded the guidance drawn from <u>Strickland v. Washington</u>:

A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  Strickland v. Washington, 466 U.S. at 689.  The challenger's burden is to show "that counsel made errors so serious that counsel was not  functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding."  Id. at 693.  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 687.

Harrington v. Richter, 131 S. Ct. 770, 787-88 (2011); see also Berghuis v. Thompkins, 130 S. Ct. 2250, 2264 ("To establish ineffective assistance of counsel, one 'must show both deficient performance and prejudice.'" (quoting Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419, reh'g denied sub nom. In re Word, 129 S. Ct. 2422 (2009) (citing Strickland v. Washington, 466 U.S. at 687))), reh'g denied, 131 S. Ct. 33 (2010) (other citations omitted).

The United States Court of Federal Claims in Lopez-Velazquez v. United States also relied on the Strickland v. Washington test to evaluate the ineffective assistance of counsel claim in the context of a request for discharge from the United States Air Force instead of trial by court-martial.  In Lopez-Velazquez, the court wrote:

a plaintiff alleging ineffective assistance of counsel must demonstrate that (1) "counsel's performance was deficient" such that "counsel was not functioning as the 'counsel' guaranteed...by the Sixth Amendment" and (2) plaintiff was prejudiced by the deficient performance. [Strickland v. Washington,] 466 U.S. at 687.  Under the first prong, a plaintiff "must show that counsel's representation fell below an objective standard of reasonableness…." [I]d. at 688, 104 S. Ct. 2052.  Under the second prong, a plaintiff "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill [v. Lockart], 474 U.S. [52,] 59 [(1985)]. A court may consider these two prongs in any order. Strickland [v. Washington], 466 U.S. at 697.

Lopez-Velazquez v. United States, 85 Fed. Cl. at 137 (omissions in original; other citations omitted).   The Lopez-Velazquez court upheld the Air Force Board for Correction of Military Record's conclusion that Mr. Lopez-Velazquez did not receive ineffective assistance of counsel, that his counsel assisted him to understand the options available and their consequences, and that a different counsel likely would not

have produced a different choice.  See id. at 132, 138-40; see also Martinez v. United States, 914 F.2d 1486, 1489 (Fed. Cir. 1990) (citing Strickland v. Washington, 466 U.S. at 690, and dismissing any reliance on ineffective assistance of counsel in the case).

Mr. Harris has not offered any evidence to suggest that counsel's advice was objectively unreasonable or inaccurate, or that the advice would have changed had counsel known about problems with the DNA testing and that Mr. Harris subsequently would be cleared of several charges of which he stood convicted at the time, given that he was not cleared of the charge of making false official statements, UCMJ Article 107, 10 U.S.C. § 907.  Mr. Harris states in his submissions to this court that counsel advised plaintiff "to resign, as he could have been plagued" with a more stigmatizing, other than honorable discharge if he appeared before a Board of Inquiry.  It is not clear, or even likely, that the advice offered by counsel for only the UCMJ Article 107, 10 U.S.C. § 907, false official statements conviction, would have been different, even after the revelations regarding the DNA testing.  Mr. Harris retained significant exposure for an other than honorable discharge.  As Mr. Hester noted in his advisory opinion to the BCNR, Mr. Harris remains convicted of a charge that "casts an unfavorable reflection on his honesty, integrity, trustworthiness."

Nor has Mr. Harris made any allegation or offered any evidence to support a contention that he relied exclusively or extensively on counsel's advice or that his final decision not to face a Board of Inquiry and to resign rested with any individual other than himself.  Mr. Harris also has not offered any evidence to suggest that counsel failed to inform him of all the options that might have been available to him, or of the respective consequences of those options.  Mr. Harris has not alleged that counsel applied any form of direct or indirect coercion or duress.  Consequently, plaintiff has not proven that "but for counsel's errors," plaintiff would not have chosen to resign.  See Hill v. Lockhart, 474 U.S. 52, 59 (1985).  Therefore, the court finds that the advice counsel gave Mr. Harris was neither ineffective nor detrimental, and did not restrict plaintiff's ability "'to exercise free choice'" to voluntarily resign.  Scharf v. Dep't of the Air Force, 710 F.2d at 1574 (quoting Perlman v. United States, 203 Ct. Cl. at 408, 490 F.2d at 933).  Moreover,  at the time plaintiff received counsel's advice, the issues surrounding the DNA evidence and the two offenses the Navy would later set aside, were not apparent.  See Strickland v. Washington, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").  Plaintiff has not identified any "deficient performance," or "serious, unprofessional errors" on the part of his counsel, as required for a meritorious claim of ineffective assistance of counsel.  See Harrington v. Richter, 131 S. Ct. at 787-88.


## CONCLUSION

For the foregoing reasons, the defendant's motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim are **GRANTED**.  For plaintiff's claims

not otherwise dismissed, defendant's motion for judgment on the Administrative Record is **GRANTED**.   Plaintiff's cross-motion for judgment on the Administrative Record is **DENIED**.   The plaintiff's complaint is **DISMISSED**.   The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

      **IT IS SO ORDERED.**

s/Marian Blank Horn<br>
**MARIAN BLANK HORN**<br>
**Judge**